Filed 5/31/24  Stelmach v. Plastipak Packaging CA5
(unmodified opinion attached)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANASTAZJA STELMACH,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>PLASTIPAK PACKAGING, INC., et al.,<br><br>Defendants and Respondents. | F085844<br><br>(Super. Ct. No. CV-18-002438)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING (NO CHANGE IN JUDGMENT)** |

It is hereby ordered that the nonpublished opinion filed herein on May 14, 2024, be modified as follows:

1. On page 15, the second sentence in the third paragraph is deleted and replaced with the following sentence:

   Stelmach also submitted a declaration from Juror No. 1, who stated that in terms of whether he believed plaintiff or defendant, he leaned 60 percent in favor of plaintiff and 40 percent in favor of defendant, he recalled plaintiff's argument that Barahona could only have known to take photos of the space between the pallets and wall if he had assaulted her, which made sense to him, and he also recalled Miller's closing statement that plaintiff told Dr. Friedman the location of the assault, which made sense to him and helped explain how the defendant knew to take photos of the area where the assault happened.

1.

2.  On page 38, the Disposition is deleted in its entirety and replaced with the following paragraph and footnote:

**<u>DISPOSITION</u>**

The judgment is affirmed.  The parties shall bear their own costs on appeal.[16]

Except for the modifications set forth, the opinion previously filed remains unchanged.  This modification does not effect a change in the judgment.

Appellant's petition for rehearing filed on May 29, 2024, is denied.


                                                                                    DE SANTOS, J.

WE CONCUR:


LEVY, Acting P. J.


POOCHIGIAN, J.

---

[16]     Our Supreme Court recently held that "[a]n appellate court may not award costs or fees on appeal to a prevailing FEHA defendant without first determining that the plaintiff's action was frivolous, unreasonable, or groundless when brought, or that the plaintiff continued to litigate after it clearly became so." (*Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 950–951.)  Plastipak and Barahona, the prevailing FEHA defendants, have not asked us to determine that Stelmach's action was at any point frivolous, unreasonable, or groundless.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANASTAZJA STELMACH,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>PLASTIPAK PACKAGING, INC., et al.,<br><br>Defendants and Respondents. | F085844<br><br>(Super. Ct. No. CV-18-002438)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  John D. Freeland, Judge.

Thyberglaw, Gregory A. Thyberg; Law Offices of Johnathan Durham, Jonathan Durham; and Schwinghamer Law, Noah Schwinghamer for Plaintiff and Appellant.

Cummings, McClorey, Davis, Acho & Associates and Ryan D. Miller for Defendants and Respondents.

-ooOoo-

Anastazja Stelmach sued Plastipak Packaging, Inc., and Ovidio Barahona (collectively, defendants), alleging that while she was working at Plastipak, Barahona, who was her supervisor, sexually assaulted her in a company warehouse.  After a 12-day trial on her claims of sexual battery, hostile work environment sexual harassment, and

failure to prevent, investigate, and remedy sexual harassment, the jury rendered its special verdict in defendants' favor on all claims. The trial court denied Stelmach's motion for a new trial.

On appeal from the resulting judgment in defendants' favor, Stelmach contends the trial court erred in denying her motion in limine to exclude DNA test results and in not granting a new trial based on misconduct by defense counsel during trial and in closing argument. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Trial Testimony

Stelmach did not designate all the trial proceedings for inclusion in the reporter's transcript. Rather, she designated some proceedings on the motions in limine, the defense's opening statement, the testimony of select witnesses, the parties closing arguments, and the jury polling. A summary of the testimony provided follows.

Stelmach worked for a staffing agency, Balance Staffing, which placed her at Plastipak in mid-April 2018. Plastipak manufactures plastic bottles, which are placed on pallets with cardboard sheets between the layers of bottles. The pallets are stored at Plastipak warehouses until a customer orders the bottles. Customers return the pallets and cardboard sheets to Plastipak so they may be reused. Stelmach worked as a dunnage sorter—she sorted the cardboard sheets to ensure they were not contaminated and restacked them on an empty pallet so Plastipak could reuse the sheets. Stelmach worked at two Plastipak warehouses—one was located on Leckron Road and the other on Finch Road. Barahona was Stelmach's supervisor.

Barahona assigned Stelmach to the Finch warehouse, where she worked with one other Plastipak employee, Jose Flores, who drove the forklift. A structure was inside the Finch warehouse that served as an office, restroom, and break room. Stelmach testified that when she first went to the Finch warehouse, Flores made inappropriate comments to her. Twice Flores turned off the lights when she was in the break room and said they

2.

could lay down, and twice he came towards her sorting table in the dunnage area and asked her to lay on the pallets with him. During one of those incidents, Flores told her he had not had sex with his wife in two years. Stelmach felt he was trying to see if she would go along with his advances.

Stelmach testified that Barahona started making advances toward her when she moved to the Finch warehouse. He made comments that she felt were designed to see how far he could go with her, such as telling her his wife did not satisfy him sexually, and his comments made her uncomfortable. She claimed that on one occasion, Barahona told her they were going to cut one of the two dunnage sorters, and he later told her they were going to let go of the other dunnage sorter, Clara Lopez.

Stelmach testified that on Friday, May 11, 2018, while she was working at the Finch warehouse, Barahona walked up to her and told her she looked tired. She told him she was, and she was trying hard not to cry because her boyfriend broke up with her. Barahona then grabbed her hand and pulled her away from the sorting table behind the pallet. He pinned her against the wall behind the pallet, which had dunnage on it, and started kissing her. The pallets were two or three feet from the wall.

Stelmach tried to get away, but he grabbed her waist with both arms. He stuck his right hand into her pants and put it on her genitals. She pulled his hand out after about five to seven seconds. He dragged her to pallets that were stacked hip-high, bent her over them, and stuck his hand in her underwear; at least one of his fingers penetrated her vagina. She pulled his hand out again. Barahona unbuttoned her jeans and tried to pull her pants down, but when they did not come off, he digitally penetrated her again. Stelmach managed to get away from Barahona and ran out of the warehouse. As she was leaving, she saw Flores, who was the only other person working in the warehouse that day, sitting in the office.

Stelmach went straight home. She called a friend and told her what happened. Stelmach called Balance Staffing and told them her supervisor at Plastipak assaulted her

3.

and she was not going back.[1]  She then called the Modesto police department.  Officer Bret Babbitt came to her home and took a police report.  She went to the hospital, where medical personnel performed a sexual assault examination that included taking a swab of her vaginal area.  After the exam, she was released from the hospital and went home.

Stelmach saw Dr. Elizabeth Zdradzinski, a licensed marriage and family therapist psychologist, twice, once in May 2018 and once in June 2018, who advised her to follow-up with her primary physician.  She was prescribed antianxiety and antidepressant medications, but she did not take them for long because she was afraid of addiction.  She also coped with her emotional injury by abusing alcohol.  She was an alcoholic who had been sober since September 13, 2020.  She was raped by a former boyfriend in 2015.

Barahona denied sexually harassing or assaulting Stelmach.  He testified when he got to the Finch warehouse to perform inspections on May 11, 2018, he saw Stelmach and Flores coming out of the break room.  Barahona put his keys down in the office and used the restroom, and when he came out of the office, Stelmach was in the dunnage area and Flores was on the forklift.  Barahona started to walk the floor.

Barahona noticed that Stelmach looked disheveled.  Flores told him something was wrong with her.  Barahona went over to Stelmach and asked if she was okay. Stelmach told him about the fight with her boyfriend and that she broke up with him. Barahona denied that he engaged in any of the physical acts Stelmach described, or that he told her his wife was not pleasing him sexually.  While Barahona was talking to Stelmach, Flores was loading and off-loading a truck and passed by them multiple times

---

**1**      An email from Patricia Gould to Felicia Caballero, both of whom worked for Balance Staffing, states that Gould spoke with Stelmach at 11:06 a.m. on May 11, 2018. Gould reported that Stelmach told her Barahona sexually harassed her—he kissed her and tried to stick his hand in her pants and pushed her up against the dunnage area—and she did not return after lunch.  Gould followed up with her later that afternoon and Stelmach told her she filed a police report and was sent to the hospital to get checked out.  Gould stated she called Sandoval and told him Balance Staffing was investigating Stelmach's complaint.

4.

on his forklift.  Barahona denied that Flores was in the office.  After he spoke with Stelmach, they walked toward the office.  Stelmach left the warehouse for lunch, and he walked into the office.

Barahona called Patricia Gould at Balance Staffing around noon to inform her that a forklift operator was cleared to start work the following Monday.  He also texted Stelmach to find out why she did not return to work.  He got Stelmach's phone number from Clara Lopez.

Barahona was shown some photos that were taken of the inside of the Finch warehouse.  Several photos showed an 18-inch-wide white perimeter line on the floor around the edge of the warehouse walls.[2]  Barahona explained the pallets are supposed to be stacked along the wall right up to the white line to maximize space.  Sometimes pallets would be out of place, such as four to six inches away from the white line.  If he found that during his inspections, Barahona would have the pallets restacked and pushed as close to the line as possible.  It was not the normal standard to have pallets stacked two feet from the white line, as everyone was trained to try to push pallets close to the white line.  One photo showed a gap between the white line and the pallets.  Barahona explained that normally they try to get the pallets as close as possible, but the photo showed sheets were overhanging the pallets, which would require extra space.  He also explained the dunnage is stacked the same way as everything else—it is stacked as high as possible with a 12-inch gap between each row to maximize space.  He testified it would be difficult to fit between the sorting table and the drywall and it would be hard to embrace Stelmach in that space.

---

[2]      On cross-examination, Stelmach was shown a photo of a stack of pallets that were positioned right on the white perimeter line.  Stelmach testified that was not like the area Barahona pulled her into.  On that day, there were pallets of dunnage stacked higher than their heads that were not pushed up to the white line.  The gap between the pallets and the wall was bigger than the one shown in the photo, as the pallets were two to three feet from the wall, or a foot or two away from the white line.

Marcos Sandoval, Plastipak's human resources manager, learned of Stelmach's sexual harassment complaint from Balance Staffing. Sandoval informed Paul Harpaul, the site manager, about the complaint and went to talk to Barahona. Sandoval, Barahona's supervisor Ron Costa, and Harpaul met with Barahona. Sandoval asked Barahona if anything happened between him and Stelmach. At Sandoval's request, Barahona wrote a statement about what occurred that day—he described how he went to talk to Stelmach because she looked tired and the details of their conversation, and stated that while they were talking, Flores was driving back and forth off-loading a truck.

The following Monday, May 14, 2018, Sandoval reviewed video footage which showed Barahona leaving the Leckron warehouse at 9:29 a.m. and Stelmach punching out at 9:55 a.m., which left a 26-minute window. Sandoval interviewed Flores and had him write a statement about what he was doing and what he saw on May 11, 2018. Flores wrote that he was unloading shuttles or trucks when he noticed Barahona and Stelmach speaking in the dunnage area. Every time he drove by, they were in the same spot speaking, and he did not see any type of contact or touching. He was unloading two shuttles. He passed Barahona and Stelmach around 22 times and each time they were in the same spot speaking. As Flores was coming to the office, Barahona and Stelmach were walking behind him. Stelmach left for lunch at 9:55 a.m. and never returned.

Flores testified at his deposition that the interaction between Barahona and Stelmach lasted four to five minutes, but at trial he claimed it lasted a little longer than that. When asked if he could make 22 trips in four to five minutes, Flores responded: "Well, why not? The bin's not far from the trailer. I should be able to." He later testified it would take two to three minutes to complete a round trip.

Flores testified on redirect that during his deposition, he said he took 22 trips and passed Barahona and Stelmach 44 times, but it really was 11 trips because he was taking two pallets at a time, which meant he passed them 22 times. It was clear to Flores that he was unloading a truck that morning, but it was not entirely clear how much time it took

him to do so. Flores recalled testifying in his deposition that Barahona spoke with Stelmach twice that morning. The first conversation lasted about six minutes, while the second lasted 20 to 25 minutes.

Barahona had a felony conviction for permitting a child to suffer under circumstances likely to cause great bodily injury or death. When he applied for employment at Plastipak in 2007, he denied that he had ever been convicted of a felony on his application. Barahona testified he lied about the conviction because he was 20 years old with two children and needed a job. He claimed he never told anyone at Plastipak about the felony conviction. He applied to have the felony expunged in 2012. Sandoval provided an employment verification letter at Barahona's request, which Barahona submitted with his application. Barahona did not tell Sandoval why he wanted the employment verification letter.

Blaine Kern, a forensic scientist who testified for Stelmach as an expert in the field of DNA identification, reviewed Stelmach's deposition, medical notes and police reports related to Stelmach's sexual assault case, and a laboratory report from the Department of Justice laboratory in the Central Valley.[3] Kern confirmed the records showed Stelmach underwent a sexual assault examination which involved taking swabs from the exterior pubic area to see if there was any DNA from the assailant.

Kern testified the laboratory report, which was entered into evidence, showed they found a mixture of DNA from two individuals—the major component was from Stelmach, and a minor, partial DNA profile was from an unknown male, who was likely Stelmach's boyfriend as Stelmach told the forensic nurse she had intercourse with him prior to this event. Barahona was excluded as a DNA contributor to the sample.

---

[3] Stelmach did not designate Kern's testimony for inclusion in the reporter's transcript. Instead, defendants moved to augment the record with his testimony, which motion we granted.

Kern was not surprised that Barahona's DNA would not be present. He explained the sample can be overwhelmed with other people's DNA so that touch DNA may be present but undetectable, and touch DNA rubs off more easily than saliva or semen. In addition, there were limitations with the type of testing that was performed. Kern noted there was a six-hour interval between the assault and when the sample was taken, which would lessen the amount of available DNA. In Kern's opinion, the absence of Barahona's DNA did not mean he did not touch her, as he may have touched her, but they were not able to get a profile. Kern conceded he did not know if Barahona's DNA was present, there was no physical evidence that showed the presence of his DNA, and it was speculative to say there was a third contributor, as more testing would need to be conducted to ferret that out.

Defense expert Dr. Howard Friedman, a neuropsychologist, interviewed Stelmach on June 15, 2020, administered several tests to look at Stelmach's cognitive, intellectual, and emotional functioning, and reviewed documents such as Stelmach's medical records, her deposition, and employment records. He found she did not have an intellectual problem that might relate to an emotional condition as her attention, concentration, and processing speed were average to superior. Stelmach's emotional functioning was fine, and Dr. Friedman did not find any indication of depression or acute anxiety. He only diagnosed Stelmach with alcohol-use disorder, which was in early remission.

Dr. Friedman disagreed with Dr. Zdradzinski's provisional diagnosis of posttraumatic stress disorder (PTSD) as all the symptoms needed to diagnose PTSD were not present and she could not possibly predict Stelmach would develop a full array of symptoms. In fact, Stelmach got better with treatment and medication. Dr. Friedman did not find Stelmach consistent in what she told him compared to the records. For example, she denied a history of depression to him, but the records showed she reported having been depressed at times, and her reports of the incident differed. Dr. Friedman did not

trust that Stelmach provided a consistent description of what is going on with her, as she exaggerated her cognitive difficulties despite functioning well.

It is unclear from the record provided how many other witnesses testified, as only one minute order of the trial is in the clerk's transcript. At a minimum, it appears testimony was received from Theresa Haley, the nurse practitioner who performed the exam of Stelmach at the hospital, Dr. Zdradzinski, Officer Babbitt, Clara Lopez, Ron Costa, and Cara Brown, although the parties' witness lists showed additional names. Also, excerpts of the video depositions of Harpaul, Gould, and Barahona were played for the jury, but they were not entered into evidence and there is nothing in the record to indicate what those witnesses testified to in their depositions.

### Closing Arguments

As pertinent here, Stelmach's attorney argued in closing that the case involved a huge cover-up by Plastipak, and he had not "seen a corporation fight so hard to suppress the truth and to deny Ms. Stelmach justice." Stelmach's attorney believed Plastipak's witnesses had committed perjury and they all "testified falsely about very important parts and critical facts in this case." Her attorney further argued Barahona knew facts only the perpetrator could know, as Barahona claimed he knew from the outset that Stelmach accused him of sexual assault, yet Sandoval denied telling him the specific allegations of the complaint. The attorney asserted that while Plastipak took the photos of the warehouse the day before Stelmach's deposition, they did not know she was claiming the assault occurred behind pallets or product, and they could only have known that if Barahona told Plastipak what he had done and where it occurred.

Stelmach's attorney asserted that defense counsel was going to argue Stelmach should not get money because she is an alcoholic or due to other things to try to take money off the scale. Her attorney further asserted that a defense attorney is "like the defense. They don't want any score. They want it to be zero. They don't want anything

to—want her to receive any money." The attorney ended by arguing that total damages of $5 to $8 million were appropriate.

Defense counsel began his argument by relating the story of a high school football player who was falsely accused of rape and lost his opportunity to play in the NFL. Defense counsel then stated, without objection, that he wanted to "correct something," as Stelmach's attorney said "we don't like to pay money. I don't mind paying money all the time when I've got a real claim. It's one of the great things about representing people like Plastipak. If I see that there's exposure that Plastipak did something wrong, I advise them, and they listen to my advice. This just doesn't happen to be one of those cases. And I think you'll see, like Plastipak, you'll look at it, like, there's not enough evidence to do that."

Defense counsel asserted Stelmach gave varying accounts to people about what happened: "Like initially there was, 'He tried to put his hand down my pants.' Then it was, 'He put his hand to my vaginal but no penetration.' Then it was penetration. She told Officer Babbitt she went home and took a nap. She also said she called her friend, then called the police immediately. There's a lot of inconsistencies."

Defense counsel argued it would be "kinda tough" for Barahona and Stelmach to cram into an 18-inch space behind the pallets. Defense counsel stated he could tell the jury exactly how they knew to take the warehouse pictures before Stelmach's deposition: "It wasn't because Ovidio Barahona told us because she was—experienced this thing, because he didn't; it was because in … June 15th of 2020, a year and a half almost before her deposition, she met with Dr. Friedman. We hired Dr. Friedman to do an interview of her and to tell us what we're dealing with and—"

Stelmach's attorney objected and stated: "He's misstating, like, when Ms. Stelmach met in relation to the pictures. [¶] You're saying that—what was the date? Pictures were 2019. She was seen by Dr. Friedman in 2020." Defense counsel continued: "Well, I will tell you it—we did not get that information from Ovidio

10.

Barahona. His story's been consistent the whole time. He's never—you look at his written statement, it's what he's always said. He's never changed. Like where plaintiff has changed some details, his has always been consistent." Later, defense counsel stated that Stelmach met with Dr. Friedman on June 15, 2020, and she was deposed already on November 22.

In discussing whether Stelmach was subjected to a hostile work environment, defense counsel asserted her claims hinged on the sexual assault, as Flores's overtures and Barahona talking about his sex life were insufficient to be sexual harassment since it must be "severe and pervasive." Defense counsel started to read from a PowerPoint slide with a quote attributed to a United States Supreme Court case, but Stelmach's attorney objected as a misstatement of the law that he was showing the jury. The trial court asked defense counsel to take it down, as it was "not part of the jury instructions." Defense counsel went on to the next slide and started to read from it, but then stated: "By the way, I dispute that claim, but I'm respectful to the Court. I think it is an accurate statement of the law. But …"

Defense counsel conceded that if Barahona did what Stelmach claimed, it would be an unwanted sexual advance, but he did not think Stelmach had proven more likely than not that it happened. He displayed another PowerPoint slide with a quote attributed to a 2019 case. Stelmach's attorney objected and said he was "displaying that thing again." Defense counsel responded it was a different quote from a different case. Stelmach's attorney did not want anything other than jury instructions displayed. Defense counsel asked if that was the court's order and the court responded that it was.

Defense counsel asserted Stelmach's attorney asked some questions about records or communications between Plastipak and its attorneys or employees related to the litigation, so he wanted to point out there are privileges allowed by law. Defense counsel believed Stelmach's attorney tried to make it look like Plastipak was hiding something, but they were exercising a privilege. Defense counsel displayed a jury instruction on the

exercise of a communication privilege, but Stelmach's attorney objected, stating it was not one of the jury instructions. Defense counsel responded that he thought it was and he "thought Your Honor read exercising a communication privilege. I thought we discussed that." The trial court responded, "No, we didn't." Defense counsel apologized, but then went on to argue about Plastipak exercising its privileges without objection.

When addressing damages, defense counsel argued: "So what's the appropriate amount of damages? When I heard 5 to 8 million, that's sticker shock. Holy cow. For someone—look, I've—this isn't my first sexual harassment case, sexual assault case. I settle these cases. I settled one earlier this year." Stelmach's attorney objected based on "[i]mproper discussing settlement." The trial court sustained the objection.

In rebuttal, Stelmach's attorney asserted defense counsel's closing argument consisted of misstatements of law, ignoring evidence, and attempting to steal justice. Stelmach's attorney addressed the warehouse photos, stating: "[I]f you look at that thing [defense counsel] put up when Ms. Stelmach visited Dr. Friedman, it was June 2020 when she visited Dr. Friedman …. These pictures were taken back in November of 2019, and somehow he tried to mislead you to believe that somehow they got information in an interview with Dr. Friedman about pallets and where they were stacked, trying to mislead you on the facts, trying to mislead this jury."

After arguments were completed, a discussion was held outside the jury's presence in which Stelmach's attorney objected to defense counsel's closing statement, asserting it contained misstatements which he believed defense counsel knew to be false, improper argument, discussions of settlement, and discussions of law and jury instructions that were not approved by the court. Stelmach's attorney asked that defense counsel's PowerPoint presentation be attached to the record. Defense counsel objected, stating it was "legal argument," he "took down the slides that were objected to, and … the objections were sustained."

Stelmach's attorney disagreed, explaining: "It was a PowerPoint presentation which proceeds chronologically. So every slide in the presentation was shown to the jury, some of them for shorter amounts of time, but I would just request that the entire PowerPoint be given to the Court so that they can maintain a copy and attach it to the record." The court agreed over defense counsel's objection.

Stelmach's attorney added that on multiple occasions defense counsel misstated the standard by saying "severe and pervasive" rather than "severe or pervasive." He thought it is "more than a coincidence" that defense counsel put a misstatement of law in front of the jury that he did not bring up when they discussed jury instructions and which he did not show to Stelmach's attorney for approval before putting it in front of the jury. Defense counsel responded that Stelmach's attorney also misstated the law and facts and claimed things were perjury when they were not.

Thereafter, the trial court admonished the jury about Miller's misstatements of law as follows: "Ladies and gentlemen, you are not to consider any legal authorities put up by defense counsel in his PowerPoint presentation except the law that was provided by the Court." The trial court then re-read the instruction which explained the meaning of " 'severe' or 'pervasive.' "[4]

### The Jury's Verdict

The jury returned a special verdict in which it found in defendants' favor on all causes of action. On the sexual battery cause of action, the jury answered "No" to the first question (Question No. 1): "Did Ovidio Barahona intend to cause a harmful or offensive contact with Anastazja Stelmach's sexual organ and a sexually offensive

---

[4] The excerpt of the reporter's transcript that contains the admonition and additional instruction was an exhibit to Miller's declaration in opposition to the motion for new trial. We note that while the excerpt from the reporter's transcript states that the proceedings were held outside the jury's presence, that does not appear to be the case since the trial court clearly was addressing the jury. Moreover, Miller stated in his declaration that the trial court admonished the jury as stated in the exhibit.

13.

contact with Anastazja Stelmach resulted, either directly or indirectly?"  On the hostile work environment sexual harassment claim, the jury answered "No" to the first question (Question No. 4):  "Was Anastazja Stelmach subjected to harassing conduct because she is a woman?"  On the failure to prevent harassment, discrimination or retaliation claim, the jury answered "No" to the first question (Question No. 10):  "Was Anastazja Stelmach subjected to harassment in the course of employment?"  The jury also answered "No" to Question Nos. 15 and 16, which concerned punitive damages.

The jury was polled.  On the first question, the verdict was 9-3, with Juror Nos. 1 and 2 stating they were undecided, while Juror No. 10 stated it was not his verdict.  On Question No. 4, the verdict was 11-1, with only Juror No. 2 stating it was not his verdict.  On Question No. 10, the verdict was 9-3, with Juror Nos. 1 and 11 undecided, and Juror No. 2 stating it was not his verdict.  On Question 15, the verdict was 9-3, with Juror Nos. 1 and 11 undecided, and Juror No. 2 stating it was not his verdict.  On Question 16, the verdict was 10-3, with Juror Nos. 1 and 2 stating it was not their verdict.

### The Motion for New Trial

Stelmach filed a motion for new trial alleging misconduct of defendants' attorney.  As pertinent here, Stelmach argued defense counsel committed misconduct during trial when he:  (1) displayed an exhibit to the jury that referenced Stelmach's 2009 DUI felony in violation of a motion in limine; and (2) texted a witness while the witness was testifying via Zoom.  Stelmach argued defense counsel committed misconduct during closing argument when he:  (1) argued that Barahona did not sexually assault Stelmach knowing Barahona committed the assault; (2) misrepresented the "severe or pervasive" sexual harassment legal standard; (3) displayed a slide that included quotes from an exhibit that was not entered into evidence; (4) displayed a jury instruction that was not approved by the court; (5) made false statements about critical facts; and (6) made improper arguments about settling sexual harassment cases.  Stelmach sought to recover monetary sanctions to cover her attorney fees and costs of the trial.

14.

In support of the motion, Stelmach submitted the declarations of her attorneys, Jonathan Durham, Noah Schwinghamer, and Gregory A. Thyberg. They documented the trial proceedings and the amount of attorney fees and costs requested.

Defendants filed written opposition to the motion, arguing their attorney did not commit prejudicial misconduct. In support of their opposition, defendants submitted the declaration of their attorney, Ryan D. Miller, and two jurors. One juror, who was Juror No. 1, declared that he never saw evidence suggesting Stelmach was a felon. He further declared that Stelmach's criminal history, the law defense counsel cited, and the comments and argument of the attorneys, were not discussed or mentioned during deliberations. The other juror also stated that she did not hear anyone mention Stelmach having a felony or criminal record, and that during deliberations, the comments and arguments of the attorneys were not discussed, and she did not hear any juror comment on the law or argument brought up by any attorney.

Along with the reply brief, Stelmach's attorneys, Durham and Thyberg, submitted additional declarations. Stelmach also submitted a declaration from Juror No. 1, who stated that in terms of whether he believed plaintiff or defendant, he leaned 60 percent in favor of defendant and 40 percent in favor of plaintiff, he recalled plaintiff's argument that Barahona could only have known to take photos of the space between the pallets and wall if he had assaulted her, which made sense to him, and he also recalled Miller's closing statement that plaintiff told Dr. Friedman the location of the assault, which made sense to him and helped explain how the defendant knew to take photos of the area where the assault happened. Juror No. 1 also recalled the judge instructed the jury on multiple occasions to disregard things Miller had said or shown, but he was not completely clear on what the jury was allowed to consider since it happened multiple times.

After oral argument, the trial court denied the new trial motion, stating in a minute order it found "the motion fail[ed] to demonstrate sufficient grounds for a new trial on any of the issues asserted" and "[t]here was no actual prejudice to the moving party."

15.

## DISCUSSION

### I.     The Motion in Limine on DNA Evidence

Stelmach contends the trial court erred in denying her motion in limine to exclude the DNA evidence.  She asserts defense counsel committed misconduct when, in opposing the motion in limine, he misrepresented the law to the trial court concerning the admissibility of the DNA report.  Stelmach asserts that due to this misrepresentation, the trial court did not properly exercise its discretion when it denied the motion and if it had known the true state of the law, it would have granted the motion.

#### A.     *Trial Proceedings*

Stelmach brought a motion in limine to exclude the results of Stelmach's DNA test based on the parties' failure to designate an expert to testify about the results of the test.  Stelmach quoted from the "Physical Evidence Examination Report" as follows:  "A mixture of DNA from at least two individuals, consistent with one major and one minor contributor, was obtained from the Mons Pubis swa[b] (Item 1) associate[ed] with Anastazja Stelmach."  Stelmach asserted this meant the DNA test revealed Stelmach's DNA as the major contributor, and her boyfriend's DNA as the minor contributor, and without an expert, it was highly probable the DNA evidence would confuse or mislead the jury, as the major and minor contributors needed explanation, and an expert was needed to testify about what the absence of Barahona's DNA meant.

In opposition, defendants argued the results of the DNA report were admissible because:  (1) the jury could infer from the negative results that Barahona did not commit the sexual assault; and (2) expert testimony was unnecessary to interpret the results, as a DNA test report could be authenticated with an affidavit and was admissible under the business records exception to the hearsay rule.  Defendants also asserted they did not

16.

designate an expert because they did not know the DNA test result existed until Stelmach brought the motion in limine.**5**

In argument to the trial court on the motion, Stelmach's attorney asked to exclude the DNA evidence under Evidence Code section 352, arguing it was clearly an area of expert testimony. Defense counsel argued an expert was unnecessary to understand if the test was negative or positive, while Stelmach's attorney argued an expert was needed to explain whether digital penetration would leave DNA. The trial court asked what the report said. Stelmach's attorney represented the report stated that Stelmach reported digital penetration for five to seven seconds, and several hours later the test was done, and they did not find Barahona's DNA. Defense counsel argued the fact that there was no DNA found did not require an expert and if Stelmach wanted to challenge the test's validity they should have designated an expert. Defense counsel further argued the evidence was relevant, the sheriff conveyed to Barahona that there was a negative test, which Barahona could be asked about when he was on the stand, and Stelmach's counsel failed to cite any case law that a report of a DNA test was inadmissible. Stelmach's attorney responded that he could find cases that discuss how "DNA is in the realm of testimony" if the court required supplemental briefing. The trial court agreed to accept further briefing.

Stelmach argued in her supplemental brief the results of the DNA test should be excluded as inadmissible hearsay. Stelmach asserted because no one from the Department of Justice, where the DNA test was performed, had been deposed or subpoenaed to trial, and defendants had not listed an exhibit that discussed DNA testing,

---

**5** In an accompanying declaration, defendants' attorney, Miller, stated that his office attempted to obtain records of the Stanislaus County Sheriff's Department's investigation into Stelmach's sexual assault complaint at the beginning of 2019, but the department refused to release the records because the case was open and pending with the district attorney. Miller stated that because defendants were unable to obtain copies of the record, they did not know that DNA test results existed until Stelmach's motion in limine.

they had no way to introduce the results of the DNA test other than presenting out-of-court statements, such as defense counsel's representation that Barahona heard the results of the DNA test were negative. Stelmach further argued the DNA test results should be excluded because their meaning and context required expert testimony. In support, Stelmach asserted *People v. Barba* (2013) 215 Cal.App.4th 712, 742 held that evidence of DNA tests is admissible if a qualified expert who is subject to cross-examination conveys an independent opinion about the test results. Stelmach argued that in the present case, there was no qualified expert to convey such an opinion and without that, the jury would have no way to know what a negative result meant under the circumstances of this case.

Defendants argued in their supplemental brief that the DNA report is not hearsay because it is not testimonial, citing *People v. Geier* (2007) 41 Cal.4th 555 (*Geier*) and *People v. Barba*, *supra*, 215 Cal.App.4th 712, and the report is admissible under the public employee record exception of Evidence Code section 1280. Defendants further argued an expert was not required to admit the test results and Barahona should be entitled to discuss the results.

After reviewing the supplemental briefs, the trial court denied Stelmach's motion in limine, finding the lack of Barahona's DNA was relevant and if there was an issue as to whether digital penetration can leave DNA evidence, an expert could be called as a rebuttal witness. Stelmach's attorney stated the supplemental briefing pointed out the only discussions of the DNA evidence so far had been hearsay from the defendant, and he assumed the motion was denied without prejudice to Stelmach's ability to object based on grounds of admissibility, hearsay, and foundation. The trial court agreed and stated it assumed there was a test that would be admitted into evidence and while it was suggested in defendants' brief that Barahona could simply testify he knew the DNA results did not reveal his DNA, the court did not think that was admissible.

In defendants' opening statement Miller stated that Stelmach testified in her deposition that Barahona's "fingers were in her vagina for up to 15 seconds." Miller stated the evidence would show Stelmach had a rape test kit done, Barahona was arrested and gave a DNA swab for evidence, and "[t]he DNA evidence came back negative."

Later in the trial, after Stelmach testified on direct examination that a sexual assault exam was performed at the hospital where a swab was taken, a conference was held outside the jury's presence about DNA experts. Both sides retained experts and wanted to use them. Stelmach's attorney objected to the defense being allowed to call an expert and stated the only reason Stelmach retained a rebuttal expert was because of the trial court's ruling on the motion in limine allowing defendants to bring up the issue if they could "establish a foundation." Stelmach's attorney again objected that the DNA evidence was inadmissible hearsay and there was no foundation for it. Defense counsel objected to reopening the motion in limine, asserting the trial court already ruled on it. Stelmach's attorney agreed the trial court ruled on the motion and emphasized the court ruled that Stelmach could have a rebuttal expert, but the court did not allow a defense expert. The trial court took under submission whether defendants could call their own expert.

The next day, Stelmach's attorney made an offer of proof concerning the testimony of Stelmach's DNA expert. Defense counsel stated his expert was the one who ran the test and explained what her testimony would be. After Stelmach's attorney again argued defendants should not be able to use an expert because the motion in limine ruling only allowed Stelmach to call a rebuttal expert, the trial court decided to exclude the defense expert.

Defense counsel, who believed the trial court ruled the DNA report was hearsay, asked the trial court to explain to the jury that the evidence was not allowed since he mentioned the negative DNA evidence in his opening statement. The trial court responded that the report was admissible if he laid a proper foundation. Stelmach's

19.

attorney offered to stipulate to the fact there was a DNA test.  Defense counsel responded that his expert could authenticate the record even if she did not offer an opinion because she performed the test.  Stelmach's attorney stated that to save time, they may as well stipulate to it or their expert could testify that he reviewed the document and testify to the contents.  Defense counsel objected to Stelmach's expert if his expert was going to be excluded, since an expert was not needed if they were stipulating to authentication.  Stelmach's attorney agreed to stipulate to authentication, but added they needed their expert, which the trial court understood.

Thereafter, Stelmach's expert, Blaine Kern, testified as discussed above, and at Stelmach's request, the laboratory report was admitted into evidence.

### B.    Standard of Review

A motion in limine "is made to exclude evidence before the evidence is offered at trial, on grounds that would be sufficient to object to or move to strike the evidence." (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 26.)  "The scope of such motion is any kind of evidence which could be objected to at trial, either as irrelevant or subject to discretionary exclusion as unduly prejudicial." (*Clemens v. American Warranty Corp.* (1987) 193 Cal.App.3d 444, 451.)  " '[T]he trial court's in limine ruling is necessarily tentative because the court retains discretion to make a different ruling as the evidence unfolds.' " (*People v. Gonzalez* (2006) 38 Cal.4th 932, 958; *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 608.)

We review the trial court's ruling on a motion in limine to exclude evidence for abuse of discretion.  (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1493.)  A trial court does not abuse its discretion unless it acts in an arbitrary, capricious or patently absurd manner.  (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1419.)  Stelmach, as the appellant, has the burden to demonstrate not only did the trial court abuse its

20.

discretion in denying her motion in limine, but also that its error was prejudicial. (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446–447.)

### C.  Analysis

Stelmach's argument that the trial court abused its discretion in denying her in limine motion centers on the assertion that defense counsel, in arguing DNA laboratory reports are not testimonial hearsay and do not implicate the confrontation clause, cited *Geier*, *supra*, 41 Cal.4th 555, which she asserts was overruled by *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*).  She contends that if defense counsel had cited to the latter case, the trial court would have had no choice but to grant her in limine motion.  We disagree.

The Sixth Amendment to the federal Constitution gives a criminal defendant the right to confront and cross-examine adverse witnesses.  (*People v. Lopez* (2012) 55 Cal.4th 569, 576.)  In the seminal case of *Crawford v. Washington* (2004) 541 U.S. 36, the high court held the Sixth Amendment "bars the admission at trial of a testimonial out-of-court statement against a criminal defendant unless the maker of the statement is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination.  (*People v. Lopez*, at pp. 580–581.)

In *Geier*, our Supreme Court found no confrontation clause violation when a lab director who co-signed a DNA report, rather than the analyst who performed the DNA testing, testified at trial.  (*Geier*, *supra*, 41 Cal.4th at pp. 605–606; see *People v. Barba*, *supra*, 215 Cal.App.4th at pp. 721–722.)  *Geier* concluded, among other things, the laboratory report was not testimonial because it was a "contemporaneous recordation of observable events."  (*Geier*, at pp. 605–606.)

"[T]wo years later the high court in *Melendez–Diaz* said that a laboratory report may be testimonial, and thus inadmissible, even if it ' "contains near-contemporaneous observations of [a scientific] test" ' (*Melendez-Diaz*, *supra*, 557 U.S. at p. 315; [citation])."  (*People v. Lopez*, *supra*, 55 Cal.4th at p. 581.)  In *Melendez-Diaz*, the

prosecution introduced laboratory analysts' certificates, in lieu of live testimony, that stated a substance connected to the defendant was cocaine. (*Melendez-Diaz*, at p. 307.) The court concluded the certificates, which constituted affidavits, were testimonial and their introduction into evidence violated the Sixth Amendment. (*Id.* at pp. 310–311.) The court noted the analysts' certificates were not a traditional official or business record but was instead created "for the sole purpose of providing evidence against a defendant." (*Id.* at pp. 321–323.) Our Supreme Court acknowledged in *People v. Lopez* that its decision in *Geier* was no longer controlling precedent based on *Melendez-Diaz*. (*People v. Lopez*, *supra*, 55 Cal.4th at p. 581.)

This line of cases, however, is irrelevant to whether the DNA test results were admissible in the instant case because this is a civil, not a criminal, proceeding. The Sixth Amendment's confrontation clause applies only in criminal cases. (*People ex rel. Reisig v. Acuna* (2017) 9 Cal.App.5th 1, 32; *People v. Otto* (2001) 26 Cal.4th 200, 214 ["[t]here is no right to confrontation under the state and federal confrontation clause in civil proceedings"].) Since this is not a criminal prosecution, the confrontation clause is inapplicable. Therefore, any misconduct by defense counsel in failing to cite *Melendez-Diaz* is necessarily harmless, as the trial court only needed to determine whether the report was admissible under a hearsay exception.

In civil cases, laboratory results may be admissible as business or public employee records even when the lab technician who performed the test is unavailable. (*Coffey v. Shiomoto* (2015) 60 Cal.4th 1198, 1206, fn. 8 [" '[t]est results from authorized laboratories, performed by public employees within the scope of their duties, are admissible under the public employee records exception to the hearsay rule' "]; *County of Sonoma v. Grant W.* (1986) 187 Cal.App.3d 1439, 1448 [finding that laboratory's paternity test results were admissible under the business records exception due to testimony establishing chain of custody, despite the fact that the technicians who received and tested the samples did not testify and were not available for cross-examination]; see

22.

*Nichols v. McCoy* (1952) 38 Cal.2d 447, 448–449 [blood sample confirming elevated alcohol levels was properly admitted under the business records exception where coroner testified to the procedures followed in taking blood samples although embalmer had no personal knowledge of the decedent's identity].)

Stelmach, however, does not argue in her opening brief that the DNA report was inadmissible as a business or public employee record. In her reply brief, she asserts for the first time that the DNA report is not a business record because it was not made to facilitate business operations but rather primarily created for use at trial, citing *People v. Sanchez* (2016) 63 Cal.4th 665, 695.[6] Whether a DNA report qualifies as a business or public employee record, however, is an issue that is committed to the trial court's discretion: "The trial judge is invested with wide discretion in determining whether a proper foundation has been laid for the admission of business records under Evidence Code section 1271. [Citations.] The exercise of that discretion will not be disturbed on appeal absent a showing of abuse. [Citation.] Where the trial court has determined that the foundation laid was sufficient to support the introduction of evidence under the business records exception, and the record reasonably supports this determination, its conclusion is binding on the appellate court." (*County of Sonoma v. Grant W.*, *supra*, 187 Cal.App.3d at p. 1450.)

In ruling on the motion in limine, the trial court ruled only that the DNA evidence was relevant and admissible if the proper foundation were laid. Defense counsel was prepared to lay that foundation through the technician who performed the DNA testing, which incidentally would have satisfied any confrontation clause issue. Instead,

---

**6**     Generally, appellate courts will consider an argument raised for the first time in a reply brief only if the appellant presents a good reason for failing to present the argument earlier. (*Lister v. Bowen* (2013) 215 Cal.App.4th 319, 336–337.) Here, Stelmach has not presented a good reason for failing to raise this argument earlier. This failure represents a separate and independent ground for our rejection of her claim that the trial court erred in denying the motion in limine.

23.

Stelmach's attorney stipulated to the authenticity and admissibility of the report; therefore, Stelmach cannot now complain that the trial court erroneously admitted the report or that the report did not satisfy the business record exception. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 [evidentiary challenge forfeited where party stipulated to challenged evidence]; *Baskin v. Hughes Realty, Inc.* (2018) 25 Cal.App.5th 184, 197, fn. 6 ["an appellant forfeits the right to attack error by expressly or impliedly agreeing at trial to the procedure objected to on appeal"].)

Stelmach claims she did not forfeit this issue because once the trial court ruled the DNA report was admissible with the proper foundation and defense counsel told the jury about the negative report in his opening statement, she had to employ the best trial strategy to minimize the harm of the prejudicial information. Stelmach asserts she had no choice but to assume defendants would be able to produce a records custodian to get the report admitted, and the only way to address this was to do so in her case in chief.

Stelmach, however, could have continued to challenge the admissibility of the DNA report, just as she challenged defense counsel's use of a DNA expert. As she acknowledged below, and continues to acknowledge on appeal, the trial court's in limine ruling maintained her ability to object to the admission of the report based on hearsay and lack of foundation. While Stelmach renewed the objection later in the proceedings, the trial court never determined whether the elements necessary to establish the business or public employee records exceptions were satisfied. Rather, Stelmach stipulated to the report's admission. Stelmach's trial strategy does not show that the trial court committed legal error or abused its discretion in granting the motion in limine.

In sum, Stelmach has not shown that the trial court abused its discretion in denying the motion in limine.

## II.     The Motion for New Trial

Stelmach contends defense counsel committed gross misconduct for which the only remedy is to grant a new trial. She asserts she was denied a fair trial because

defense counsel violated the rule of ethics, evidence, and discovery to secure a win for his clients. She claims defense counsel made false statements to mislead the court and jury on the facts and law, and absent his misconduct, circumstantial evidence proves Stelmach's claim that Barahona sexually assaulted her, as Barahona knew things only the perpetrator could know and Barahona must have told defense counsel where to take the warehouse photos.

### A. General Legal Principles

Attorney misconduct is an irregularity in the proceedings that can constitute grounds for a new trial. (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 148; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 802.) However, "[a] party ordinarily cannot complain on appeal of attorney misconduct at trial unless the party timely objected to the misconduct and requested that the jury be admonished." (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1411–1412 (*Rayii*); see *Sabella v. Southern Pacific Co.* (1969) 70 Cal.2d 311, 320.) Timely objections are particularly important in this context as attorney misconduct is often curable. (*Rayii*, at p. 1412.) When an objection is made, the trial court has an opportunity both to prevent further misconduct by admonishing counsel and to preclude any potential for prejudice by instructing the jury to disregard any problematic statements. (*Ibid.*) In the absence of an objection, the misconduct cannot be cured and may instead continue. (*Ibid.*)

To prevail on a claim of attorney misconduct, a litigant must demonstrate both offending behavior and prejudice. " ' "It is only when the conduct of counsel consists of a willful or persistent effort to place before a jury clearly incompetent evidence, or the statements or remarks of counsel are of such a character as to manifest a design on his part to awake the resentment of the jury, to excite their prejudices or passions against the opposite party, or to enlist their sympathies in favor of his client or against the cause of his adversary, and the instructions of the court to the jury to disregard such offered evidence or objectionable remarks of counsel could not serve to remove the effect or cure

25.

the evil, that prejudicial error is committed….” ’ ” (*Dominguez v. Pantalone* (1989) 212 Cal.App.3d 201, 210, italics omitted.)

Attorney misconduct is prejudicial if it is reasonably probable, when considering the entire record and any instructions given to the jurors, that the moving party would have received a more favorable result absent the misconduct. (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 296; see *Cassim v. Allstate Ins. Co.*, *supra*, 33 Cal.4th at pp. 802–803 [applying the standard of prejudice stated in *People v Watson* (1956) 46 Cal.2d 818 to attorney misconduct in civil cases].)

Ordinarily a trial court has wide discretion in deciding a motion for a new trial, and the court's decision will be given great deference on appeal. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871–872 (*Decker*).) However, when we review an “order *denying* a new trial, as distinguished from an order *granting* a new trial, we must fulfill our obligation of reviewing the entire record, including the evidence, so as to make an independent determination as to whether the error was prejudicial.” (*Id.* at p. 872; *Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 296; *Martinez v. Department of Transportation* (2015) 238 Cal.App.4th 559, 568.) In making that determination, we consider the following factors: “ ‘(1) the nature and seriousness of the misconduct; (2) the general atmosphere, including the judge's control of the trial; (3) the likelihood of actual prejudice on the jury; and (4) the efficacy of objections or admonitions under all the circumstances.’ ” (*Bigler-Engler*, at p. 296.)

As stated above, we review the entire record to independently determine whether the complaining party was prejudiced by the denial of a new trial motion on this ground. (*Decker*, *supra*, 18 Cal.3d. at p. 872.) But in undertaking that review, we bear in mind that the trial court, in denying the new trial motion, found no misconduct or at least no prejudice. “ ‘ “A trial judge is in a better position than an appellate court to determine whether a verdict resulted wholly, or in part, from the asserted misconduct of counsel and his conclusion in the matter will not be disturbed unless, under all the circumstances, it is

26.

plainly wrong." ' " (*West v. Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831, 863.)

### B. Claims of Misconduct

While Stelmach complains that defense counsel engaged in numerous acts of prejudicial misconduct, her claims fail for several reasons. Many of the claims of misconduct are forfeited because Stelmach either failed to make a timely objection or failed to request an admonition. For those claims that are not forfeited, an admonishment was given. Most significantly, Stelmach has failed to provide a complete record of the trial court proceedings, which prevents us from complying with our duty to review the entire record, including the evidence, so we can independently determine whether the misconduct was prejudicial, i.e., whether it is reasonably probable the jury would arrive at a different verdict in the absence of the misconduct. (*Decker*, *supra*, 18 Cal.3d at p. 872.)

#### 1. Forfeited Claims

##### a. Presenting False Testimony

Stelmach asserts Miller committed ethical violations when he assisted witnesses to testify falsely, namely, Barahona, Flores, and Harpaul.

First, she claims Miller had to know Barahona's testimony that he did not sexually assault Stelmach was false because Barahona showed Miller where the attack occurred, and Miller then created the warehouse photos to make Stelmach's version of the assault look implausible. Stelmach argues Miller improperly told the jury he knew where to take the photos from Dr. Friedman's examination of Stelmach, which occurred after the photos were taken.

In support of her new trial motion on this point, Stelmach pointed out that according to the exhibit list, the warehouse photos were taken on November 21, 2019— the day before Stelmach's deposition. Stelmach asserted that before her deposition, she never provided the exact location of the assault to anyone but her attorney, so there was

no way Miller would know to use a photo showing the exact location of the assault or to measure the space between the pallets and the wall unless Barahona showed him. She argued that after Miller was presented with evidence of his collusion, he attempted to cover it up by lying to the jury about how he knew where to take the photos by arguing in closing that Barahona did not tell him the location, but rather he learned it from Dr. Friedman's June 15, 2020 interview of Stelmach, which Miller asserted was "a year and a half almost before her deposition."

In opposition to the new trial motion, defendants asserted the argument was based on speculation and there were other potential sources of information. Miller stated in a declaration that the police report contained information about the location of the alleged events,[7] from which reasonable inferences could be drawn, and he knew where to take the photos because Thyberg told him the alleged location during a telephone conversation.

In response, Thyberg submitted a declaration in which he denied ever having a phone conversation with Miller in which he revealed in detail any of Stelmach's allegations beyond those stated in the complaint and Department of Fair Employment and Housing (DFEH) complaint. Thyberg stated that until Stelmach's deposition, he was not

---

[7]     On appeal, Stelmach asserts the police report could not have been the source of Miller's knowledge about where to take the photos. She points out that Miller stated in his declaration submitted in opposition to her motion in limine to the exclude the DNA test results that he did not know those results existed until Stelmach filed her motion in limine since the sheriff's department would not release records related to the investigation into Stelmach's complaint. She argues that because the police report references Stelmach submitting to a sexual assault examination and Miller claimed he did not know DNA test results existed, Miller could not have been in possession of the police report before her deposition. Stelmach did not raise this argument below; therefore, the trial court could not have made a factual finding on this issue. Moreover, Stelmach asserted below that she was "not requesting a new trial based on defense counsel's *knowledge* as to where the attack occurred," but rather because he made false statements to the jury about the timeline that led him to take photos of the space between the pallets and the wall.

28.

aware Stelmach would testify the attack occurred between a stack of pallets and the wall, and Miller's statement that he told him that was where the attack occurred "is false."

To the extent Stelmach's complaint is that Miller committed misconduct in presenting Barahona's testimony knowing it was false, she did not object to Barahona's testimony on this ground during trial. The record does not show that she tried to exclude Barahona's testimony, sought an admonishment concerning his testimony or Miller's conduct, or move for a mistrial.[8] Instead, she used Barahona's testimony concerning the photos to argue that he must have been the one who disclosed the location to Miller and therefore he sexually assaulted her.

While Stelmach did object to Miller's misstatement during closing argument concerning how he learned about where to take the photos, her attorney corrected the timeline by stating the pictures were taken in 2019, but she was seen by Dr. Friedman in 2020, and he did not request an admonition. By failing to request an admonition, Stelmach forfeited the claim.[9]

---

[8] Attorney misconduct during trial, which may include an attorney's violation of the California Rules of Profession Conduct, is grounds for a mistrial. (Fairbank et. al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2023) ¶'s 12:21, 12:24.) Grounds for a mistrial are waived by the failure to make a timely and proper objection. (*Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 103 [when a party becomes aware of facts constituting misconduct, the party must promptly bring the matter to the trial court's attention or the party "will be deemed to have waived the point as a ground for a motion for a new trial"].)

[9] We note that both Miller and Stelmach informed the jury about the correct timeline. After making the objectionable statement about the timeline, Miller stated, in arguing that Stelmach's testimony was inconsistent, that she testified certain things in "her deposition November 22nd, 2019," and "Plaintiff June 15th, 2020, met with Dr. Friedman. So she was deposed already, remember, November 22nd." And Stelmach's attorney reminded the jury of this in rebuttal when he argued: "And then this whole thing about the measurements, again, look at that—if you look at that thing he put up when Ms. Stelmach visited Dr. Friedman, it was June 2020 when she visited Dr. Friedman …. These pictures were taken back in November of 2019, and somehow he tried to mislead you to believe that somehow they got information in an interview with Dr. Friedman about pallets and where they were stacked, trying to mislead you on the facts, trying to

Stelmach also contends Miller presented false testimony from Flores. Stelmach claims Flores' testimony and written statement about driving the forklift while Stelmach and Barahona were talking does not fit within the 26-minute window between when Barahona arrived at the Finch warehouse and Stelmach left.[10] Stelmach asserts Miller knew Flores's statement was false because Flores admitted at trial that he made up his written statement.[11]

Stelmach, however, did not object to Flores's testimony on this ground during trial, and did not try to exclude Flores's testimony, seek an admonishment concerning his testimony or Miller's conduct, or move for a mistrial. Moreover, Stelmach did not raise the presentation of Flores's testimony as a ground for granting a new trial in her motion. For all these reasons, she has forfeited any claim concerning Flores's testimony.

Finally, Stelmach claims that Miller was texting a witness, Paul Harpaul, while Harpaul was testifying via Zoom. Stelmach's attorneys, Schwinghamer and Thyberg, stated in their declarations in support of the new trial motion that they believed Miller was texting Harpaul because Harpaul took a long time to answer questions, he asked the court reporter to repeat questions multiple times, at one point only the top of his head was visible and he appeared to be reading something in his lap, and they saw Miller on his

---

mislead this jury. [¶] We lawyers have bounds about what we're supposed to do. We're not supposed to mislead juries on the facts."

[10] Stelmach claims Miller called a recess during Flores's testimony so he could coach Flores to change his testimony. The reporter's transcript, however, shows it was the trial court, not Miller, who called for the recess, as the trial court interrupted Miller's questioning of Flores and asked if that was a good time for a recess, and Miller agreed it was.

[11] While Stelmach claims Flores admitted his written statement was made up, the reporter's transcript shows that Flores's testimony on this point was facetious. After Stelmach's attorney asked Flores a series of questions about his written statement when compared to his deposition testimony, Flores testified the attorney confused him during his deposition. Stelmach's attorney then asked, "Isn't is true you just made this whole statement up?" Flores responded, "If you say so." It does not appear that Flores was admitting that he made the statement up, but rather was answering tongue in cheek.

phone, holding it under the counsel table and typing with his text app open.**12** Schwinghamer saw Miller with his cell phone on, unlocked, and with the text-messaging app open. In his declaration opposing the new trial motion, Miller denied texting Harpaul during his testimony.

While Thyberg asked Harpaul if he was texting during his testimony, there is nothing in the record that shows Stelmach's attorneys raised the issue during trial by bringing the matter to the trial court's attention, objecting to Harpaul's testimony on this ground, or requesting an admonition. As such, Stelmach has forfeited her contention that any misconduct with respect to texting Harpaul warrants a new trial.

### b. Displaying Excerpts from the DFEH Complaint

During closing argument, Miller displayed a PowerPoint slide entitled "Inconsistencies in Plaintiff's Account." The slide referenced statements attributed to Stelmach that she made over time in various contexts, including statements to Patricia Gould, Deputy Babbitt, Theresa Haley, and in her deposition and at trial, as well as Stelmach's August 2018 DFEH complaint. While the DFEH complaint was marked as exhibit 33 for identification and used by Stelmach's attorneys to question Barahona, according to the court clerk's exhibit list, the complaint was not received into evidence. Stelmach contends Miller engaged in misconduct by quoting from and referencing an exhibit that was not in evidence.

Stelmach, however, did not object either to Miller displaying this exhibit or to his argument concerning the inconsistencies in Stelmach's statements, and did not request an admonition. As such, she has forfeited any claim of error with respect to Miller quoting from exhibit 33.

---

**12** At one point while questioning Harpaul, Thyberg asked him: "But by the way, a few moments ago when you were looking down for that extended period, you weren't texting or receiving any text messages, were you? Harpaul answered, "No. My phone's—my phone's here." Thyberg asked him to put it further away from himself until they were done, and Harpaul agreed to do so.

31.

### c. Arguments Concerning Settlement

Stelmach contends that Miller committed misconduct by making the following statements in closing argument concerning settlement: (1) Miller doesn't "mind paying money … when I've got a real claim"; (2) if Miller sees "there's exposure that Plastipak did something wrong, I advise them, and they listen to my advice," but "[t]his just doesn't happen to be one of those cases"; (3) "I settle these cases" and "I settled one earlier this year"; and (4) "when you award damages, you're supposed to compensate somebody for their loss, not give them a lottery winning." Stelmach contends Miller committed misconduct in making these comments because they are inappropriate inflammatory statements and refer to matters outside the record.

The only one of these statements that Stelmach objected to, however, was the third one—that Miller settles these cases, and he settled one earlier this year. The trial court sustained Stelmach's attorney's objection that it was an improper discussion of settlement. Stelmach's attorney, however, did not request an admonition. Neither did her attorney object to the other statements she now complains about. As such, she has forfeited any claim of misconduct based on the settlement statements.

### d. Arguments and Jury Instruction about Attorney-Client Privilege

Stelmach contends Miller committed misconduct when during closing argument he: (1) asserted to the jury that he knew where to take the warehouse photos, not "because Ovidio Barahona told us," when Miller previously objected on attorney-client privilege grounds to Stelmach's attorney asking Barahona how Plastipak could know where to take the photos unless he told them that was where the attack occurred;[13]

---

[13] When cross-examining Barahona, Stelmach's attorney asked him if he could explain why Plastipak was taking pictures and measuring distances between product and the wall if he did not tell them that was where he attacked Stelmach. Barahona responded that he did not recall, and he was not sure why they were taking pictures there. Stelmach's attorney then asked him how defense counsel could know to take pictures and measurements of product and the wall the day before Stelmach's deposition "if, in fact,

32.

(2) displayed an instruction entitled "Exercise of a Communication Privilege" (CACI No. 215), that was not given to the jury;[14] and (3) told the jury Plastipak had the right to assert the attorney-client privilege and they fought that issue in court multiple times and won.

Stelmach contends that by objecting to Barahona's testimony and then asserting to the jury that Barahona did not tell him where the assault occurred, Miller improperly used the attorney-client privilege as a shield and a sword, and then invited the jury to speculate on other court's decisions when deciding whether defendants were improperly evading questions related to the core issues in the case.

While Stelmach objected to Miller telling the jury that he knew where to take the photos from Dr. Friedman's interview of Stelmach and to Miller displaying the jury instruction, which was taken down, she did not object to Miller's statement that Barahona did not tell him where to take the photos, or to his explanation of the attorney-client privilege. She also did not request an admonition about the matters she complains about. As such, she has forfeited the claims of misconduct on these matters.

### 2. Misconduct Claims Where Admonishment Given

#### a. Violation of in Limine Order Excluding Stelmach's Criminal History

Stelmach filed a motion in limine to prohibit any reference to Stelmach's 2009 felony DUI conviction, which was granted without opposition. Stelmach's attorney,

---

you hadn't told Plastipak, 'This is where the attack occurred so you need to ask her questions about it." The trial court sustained Miller's objection on the grounds of speculation and attorney-client privilege.

**14**     The instruction that was displayed stated: "215. Exercise of a Communication Privilege. [¶] Plastipak Packaging, Inc. and Ovidio Barahona have an absolute right not to disclose what they told their attorney in confidence because the law considers this information privileged. Do not consider, for any reason at all, the fact that Defendants did not disclose what [he/she/nonbinary [¶] pronoun] told [his/her/nonbinary pronoun] [doctor/attorney/[other]]. Do not discuss that fact during your deliberations or let it influence your decision [¶] in any way."

Durham, explained in his declaration submitted in support of the motion for new trial that he met and conferred with Miller about redacting inappropriate information from trial exhibits and he sent Miller an e-mail stating that the exhibits were full of inappropriate material that violated the court's orders, including a record that referenced Stelmach's 2009 felony for DUI. The next day, Miller sent Durham a redacted copy of a page from Stelmach's medical record.

The reporter's transcript shows that while questioning Stelmach, exhibit 132 was marked for identification and Miller stated he was looking at Bates No. 157. Miller asked if there were any objections to publishing and Durham responded, "No objections." The trial court granted permission to publish. After Miller asked Stelmach three questions, Durham requested a sidebar and that the screen-sharing stop. A sidebar was held.

Later that day outside the jury's presence, attorney Schwinghamer put on the record what transpired, asserting that Miller, without handing them a copy, placed a medical record on the projector and published it to the jury that showed Stelmach's 2009 felony DUI.[15] Schwinghamer asserted they received assurances the information would be redacted, and Miller had handed them every other record that was presented to the jury except this one. Schwinghamer asked for a limiting instruction to try to cure some of the damage and sought to exclude Stelmach's medical records as a sanction.

Miller claimed he presented the unredacted version to the jury in error and the same document was in the notebook he gave Durham that morning, which Durham

---

[15] The unredacted version of exhibit 132 is a page from Memorial Medical Center provider notes from 2014. The 2009 felony is referenced in the following paragraph under "History" labeled "HPI Comments": "Anastazja Stelmach is a 43 year old female, with a history of binge drinking, presents to the emergency department for evaluation of alcohol intoxication. Patient has been drinking and not eating a lot for the past week due to her stress from the felony she got in 2009. She states that she wants to stop drinking but she is worried about going through withdrawals. Associated symptom includes sleep disturbance. Patient reports she was in rehab in 2009 and was at an in-house treatment for 34 days and stopped drinking for 7 months."

looked at when he said he did not object to publication.[16]  He offered to stipulate to keep the one record out but objected to exclusion of the other medical records.  Ultimately, the trial court read the following curative instruction to the jury:  "During defenses' cross-examination of plaintiff, he showed a document that was removed from the screen.  This document contained unreliable information and it was a violation of a Court order to present it as evidence.  You should not consider any information contained in the document for any reason.  Do not discuss it or speculate as to what it may have contained.  Thank you."

Stelmach contends that because this was a close case based on witness credibility, the disclosure of her felony was clearly prejudicial, citing *People v. Allen* (1978) 77 Cal.App.3d 924.  There, a witness's testimony that the defendant " 'was on parole and he couldn't stand another beef,' " was found to be prejudicial, despite the trial court's admonishment to the jury to disregard the testimony, where the case was "extremely close," and the jury's factual finding was based on the credibility of the witnesses.  (*Id.* at pp. 934–935.)

Here, in contrast to witness testimony, the jury briefly viewed an exhibit that mentioned "the felony she got in 2009," which was buried in a paragraph that discussed Stelmach's comments concerning her illness, and the trial court instructed the jury to disregard the exhibit.  Certainly, the trial court was in a better position to evaluate the effect of the misconduct than we are.  (*Sabella v. Southern Pacific Co.*, *supra*, 70 Cal.2d at p. 318, fn. 5.)  While Juror No. 1 declared that he was not clear on what the jury was allowed to consider given the trial court's many admonishments, a juror's internal

---

**16**     Miller asserted in his declaration in opposition to the motion for new trial that he accidentally mistook the unredacted version of the medical record for the redacted version, he personally witnessed Durham look at the exhibit, which was the same version he used, and he asked the court for permission to publish the exhibit.  Miller said it was false that he did not show opposing counsel the document before he published it.  He asserted that he promptly pulled the document off the monitor as soon as a sidebar was requested.

thought processes, such as a juror's understanding of the instructions, cannot impeach a verdict.  (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 349.)

### b.  Misstatements of Law

Stelmach asserts that Miller misled the jury by stating that Stelmach had to prove the sexual harassment was "severe and pervasive" rather than the correct legal standard of "severe or pervasive," and by displaying a PowerPoint slide during closing argument that misquoted a California Supreme Court case concerning the severe or pervasive standard.

In defendants' opening statement, Miller asserted that "as Mr. Thyberg pointed out, for it to be sexual harassment, it has to be severe and pervasive.  And there's both a[n] objective and a subjective.  You have to know from the person, was it severe and pervasive to you."  But Stelmach did not object to this statement or request an admonition.  Therefore, any error with respect to the opening statement has been forfeited.

In closing argument, Miller asserted to be sexual harassment, the conduct must "be severe and pervasive," and he displayed a PowerPoint slide which stated, in pertinent part:  "Harassment sufficient to support a FEHA claim must be severe and pervasive—it cannot be ' "occasional, isolated, sporadic, or trivial." ' (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 131.)"  Miller was reading from the slide, including that the harassment must be " 'severe and pervasive,' " when Thyberg objected he was showing the jury a misstatement of the law.  At the trial court's direction, Miller took the slide down.

As we explained above, the trial court admonished the jury not to consider Miller's legal authorities and instructed the jury on the correct standard by re-reading the instruction that defined the terms "severe" or "pervasive."  We presume the jury understood and followed this instruction, regardless of Miller's arguments.  (*People v.*

*Martinez* (2010) 47 Cal.4th 911, 957; *Cope v. Davison* (1947) 30 Cal.2d 193, 202 [" 'the effect of misconduct can ordinarily be removed by an instruction to the jury' "].)

Stelmach asserts the jury was confused by the misstatements concerning the severe or pervasive standard as shown by the jury polling, as Juror Nos. 1 and 10 gave apparently conflicting verdicts on the questions of whether Barahona made sexually offensive contact with Stelmach, whether Stelmach was subjected to harassing conduct, and whether she was subjected to harassment in the course of employment. Whatever the reasons for these verdicts, the jury never reached the issue of whether the harassment was severe or pervasive, which only was asked on the hostile work environment sexual harassment claim. Therefore, the misstatements of law on the severe or pervasive standard could not be prejudicial.

### 3. **Prejudice**

Even if we were to conclude Stelmach's claims were not forfeited and attorney misconduct occurred, we nonetheless must affirm the trial court's denial of the motion for a new trial because the record is inadequate for us to find prejudice. In reviewing an order denying a new trial, we must review " 'the entire record, including the evidence, so as to make an independent determination as to whether the error was prejudicial.' " (*Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1160–1161.) Stelmach, however, failed to provide a complete record that would enable us to undertake such a review. As we stated above, the reporter's transcript omits testimony of an unknown number of witnesses, including Theresa Haley, Dr. Zdradzinski, Officer Babbitt, Clara Lopez, Ron Costa, and Cara Brown. Moreover, excerpts of the video depositions of Harpaul, Gould, and Barahona that were played for the jury are not in the record.

Stelmach seems to suggest the defense verdict was *presumptively* the product of misconduct because this was a credibility contest between Stelmach on one side, and Barahona and Flores on the other, and the circumstantial evidence established that Barahona sexually assaulted her, since he knew things only the perpetrator would know,

37.

and he told Miller where to take the warehouse photos.  Although Stelmach argued this theory to the jury, she claims the jury would have accepted it and found in her favor absent Miller's misconduct.

However, we cannot presume prejudice.  Instead, we are called to review the entire record, including the evidence, to independently determine whether misconduct is prejudicial, not just select portions of the record.  To overcome the presumption that the order appealed from is correct, the appellant must provide an adequate record demonstrating error.  (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 849.)  Failure to do so "precludes an adequate review and results in affirmance of the trial court's determination."  (*Estrada v. Ramirez* (1999) 71 Cal.App.4th 618, 620, fn. 1.)  Because Stelmach failed to provide such a record, we need not consider further the merits of her claims.

## **<u>DISPOSITION</u>**

The judgment is affirmed.  Costs on appeal are awarded to respondents.


DE SANTOS, J.

WE CONCUR:


LEVY, Acting P. J.


POOCHIGIAN, J.

38.